UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Novellan McAdory,

      Plaintiff,

v.                                             Case No. 08-10157

Target Corporation,                            Honorable Sean F. Cox

      Defendant.

_____/

**OPINION & ORDER**
**DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This "slip and fall"[1] case is currently before the Court on Defendant's Motion for

Summary Judgment. The parties have briefed the issues and the Court heard oral argument on

April 16, 2009. Defendant's motion raises the following two issues: 1) whether Plaintiff has

presented sufficient evidence to create an issue of fact as to constructive notice of the alleged

hazard; and 2) whether Plaintiff has presented sufficient evidence to create an issue of fact as to

whether the hazard was open and obvious to a reasonable person upon casual observation. Based

on the materials presented, the Court concludes that Plaintiff has presented sufficient evidence to

create an issue of fact as to both issues. Accordingly, Defendant's motion shall be DENIED.

BACKGROUND

This action arises out of an incident that occurred in one of Defendant Target

Corporation's retail stores. Plaintiff Novellan McAdory ("Plaintiff" or "McAdory") alleges that

---

[1]Plaintiff claims that she slipped, straining and injuring her back, but did not actually fall
to the ground.

1

"she injured her back when she slipped but did not fall on a substance on the tile floor at the
Livonia-West Target on August 28, 2006 as she was walking in the main aisle toward the check
out lanes at the front of the store."  (Def.'s Motion at ¶ 1; Pl.'s Response at ¶ 1).

A.      Plaintiff's Testimony:

        Plaintiff testified that as she was walking down the aisle, neither her friend Monia nor her
daughter, Millissa McAdory ("Millissa"), were with her.  (Pl.'s Dep. Tr. at 49 & 56).  She further
testified:

> Q.      As you were walking down the aisle towards the checkout, were you
>         looking where you were going?
> A.      Oh, yes.  I was – you know, it wasn't anything unusual.  It was the normal
>         thing that you do, you know.
> Q.      Looking straight ahead?
> A.      Yes.
> Q.      Were you looking at the displays on either side?
> A.      No, I was done shopping.

(*Id*. at 64-65).  As she was walking down the aisle, Plaintiff did not see anyone spill anything
and, as far as Plaintiff could tell, no one had walked "through the area that [she] walked through
before [she] slipped."  (*Id*. at 63).  Plaintiff testified that she did not see anything on the floor
*before* she slipped:

> Q.      As you were walking along, did you see anything on the floor at all?
> A.      No.
> . . . .
> Q.      Did you notice anything about when you looked – you didn't see it before
>         hand I take it?
> A.      No.
> . . . .
> Q.      And you didn't see anything on the floor at all?
> A.      No.

(Pl.'s Dep. Tr. at 48-49 & 65).

2

Plaintiff described the actual incident, where she slipped in the aisle of the store, as

follows:

> Q.     Now, describe for me, as best you can, how was it that you happened to slip?
>
> A.     Well, I was walking going towards the cash register.  I had my bags and I was going to check out and I was just regular – just normally just walking and all of a sudden something, you know, was caught in my feet and I am holding my basket and then I went back like that because it happened fast.
>
> Q.     You're saying that you kind of felt that the top of your body went back?
>
> A.     Yes.
>
> Q.     Do you know which foot it was that slipped?
>
> A.     Probably the right.
>
> Q.     You're thinking probably the right?
>
> A.     Yeah.  I'm just – you know, I'm not sure.  It was just normal walking, you know, I think and I jerked and went back.
>
> Q.     So, I have an impression that your foot went forward?  Is that what happened? Or did it slide backwards?
>
> A.     It was so thick and slippery, it did like go back, yeah.
>
> . . . .
>
> Q.     Now, you were walking and you had your hands on the shopping cart?
>
> A.     Yes.
>
> Q.     Did you ever let go of the shopping cart?
>
> A.     No.
>
> Q.     Did you actually ever fall all the way to the ground?
>
> A.     No, not to the ground.
>
> Q.     Did your knees bend at all?
>
> A.     Yes.
>
> Q.     And I have an impression then of what you're describing for me as you're bending back that you, when you slipped, your back arched back?
>
> A.     Yes.
>
> Q.     Did you feel anything at that time?
>
> A.     Oh, gosh, it was – yeah, I just – it happened so fast.  I remember when I jerked back, I felt, you know, just pressure coming from the back, you know.  It's not like the lower back.  It's just all over.

(*Id*. at 45-47).

Plaintiff testified that she did see a substance on the floor *after* she slipped:

> Q.     After you slipped, did you take a look to see what it was that was on the floor?

3

A.      Yeah.
Q.      What did you see?
A.      I saw this clear thick stuff on the floor.
Q.      You're saying thick.  I mean, are you saying – do you know what kind of
        stuff it was?
A.      No.  I remember the, whoever the guard was who came over, she was
        asking me what was that stuff.  She was like what was that stuff because
        you just couldn't clearly identify it because it was so thick.

(Pl.'s Dep. Tr. at 48).  She further testified:

Q.      So, you didn't see it beforehand.  Did it have any color at all or was it
        clear?
A.      It was clear.
Q.      And the floors are a white tile, right?  Do you remember?  Well these
        pictures are yellow but --
A.      It's white, yeah.   I guess, yeah.
Q.      You looked at the puddle afterwards, correct?
A.      Oh, yes.
Q.      How big was it?
A.      It was about a foot.
Q.      Was it circular or was it oblong?
A.      No.  It was kind of circular, kind of circular, but it was kind of spreaded.
Q.      So, it was about a foot across?
A.      Yes.
Q.      Right there in the center of the aisle?
A.      Yes.

(Pl.'s Dep. Tr. at  52).  She further testified:

Q.      After you slipped, did you take a step or two with your shopping cart? Did
        you stop? Did you keep going?  What happened?
A.      No, I stopped because what happened was my feet were just – you know, it
        was just going this way and that way.  And so, I'm trying to get the
        balance.  I jerked up, you know, went back, and holding – I had the basket.
        I was holding onto that for balance.  But then jerking back, you know,
        made it worse.  It was just your feet just kind of got lost, you know,
        because you couldn't get any gravity to it.
Q.      Okay.  And then did you stop right over the spot where you slipped or did
        you move over a little bit?
A.      Yes, I stopped.
Q.      When you looked down and you saw whatever it was that was on the floor
        – in fact, did you ever have any conclusion as to what that might have

4

|   | | been? |
|---|---|---|
| A. | | No.  The guard, the security lady, was asking me what did I think it was.  I told her I just don't know.  She said it is just so thick, it's just so thick.  And when I looked down, you could see like streaks, you know, streaks like the basket had, you know, been by through it. |
| Q. | | You had pushed your cart forward? |
| A. | | Yes. |
| Q. | | Do you think maybe that's what caused the streaks? |
| A. | | It was more than my basket's streaks, you know.  You know, you look and back and you say – you know, it was just streaks going through it. |
| Q. | | Did you see anything else in the – did you see any dirt or any particles or anything like that, or was it just clear? |
| A. | | It was clear, you know, but it was streaks around the area. |
| Q. | | Do you remember how many streaks might have been there? |
| A. | | Oh, no. |
| Q. | | More than one? |
| A. | | I just know it was streaks.  I didn't know how many.  I was just too shaken up to look at – think about that. |

(Pl.'s Dep. Tr. at 56-58).  Plaintiff further described the puddle to be about an inch to an inch and

a half thick, which appeared to be dry on the edges.  (*Id*. at 88-89).

B.     Millissa's Testimony:

        Millissa testified that she went to where her mother was in the store after she heard her

mother scream:

| Q. | | Had you seen – now, you said you saw some – after your mom screamed and you looked at your mom, you saw something on the floor; right? |
|---|---|---|
| A. | | Yes. |
| Q. | | Did you see that before you looked at her? |
| A. | | No. |
| Q. | | When you walked to where you were, did you walk – did you walk from the checkout lanes toward – toward where the area was, or were you walking the other way, or do you remember how you got to where you were at the time? |
| A. | | To where she was at? |
| Q. | | Yeah.  And where you were at the time you heard her scream. |
| A. | | I was on the aisle, and then I came and saw her. |
| Q. | | And just before that, where had you been in the store? |
| A. | | Probably, like, where the magazines and stuff were, maybe, and then I |

5

came down.

. . . .

Q.      So did you – did you cross the area where – where you saw your mom with
        the buggy and where she screamed? Did you walk through that area before
        she encountered that area?

A.      Yes.  I was coming down another aisle, and then I came in and then I went.

Q.      Did you see anything on the floor when you came across like that?

A.      No.

Q.      How much in advance of when you heard your mom scream was that
        when you walked by there?

A.      Probably, like, a few seconds. Maybe, like, 30 seconds.

Q.      Where there any other people by your mom when she screamed?

A.      No.  Probably – Ms. Hollins was, like, in another aisle, and she came when
        I screamed --

Q.      Okay.

A.      – and came where my mom was.

(Millissa McAdory Dep. Tr. at 19-20).  She further testified:

Q.      All right.  Did your mom – did your mom say anything besides screaming?

A.      She asked, like, what's on the floor, and I looked down and I told her, like,
        it was a big puddle, like the liquid.

Q.      Did you ever reach down and touch it?  See what it felt like?

A.      No.

Q.      Did you ever smell it?

A.      No.

Q.      What color was it?

A.      It was clear.

Q.      And can you – you say it was a big puddle.  Can you estimate just how –
        you made motion of a size with your hands.

A.      Like, probably, like, that big.  It had, like, dark tracks in it.

Q.      So you're saying – just so I'm – because – let's see if we can agree.  The
        size you put your hands was about a foot across.  Would that be fair?

A.      Yeah.

Q.      And was it round or was it kind of oblong or –

A.      It was, like, a –

Q.      So it was, like, a foot all the way around?

A.      Yeah.

Q.      And then you said there were some tracks through it?

A.      Yeah, Like, from the basket.

Q.      Did you ever see how many tracks there were in it?

A.      It was a couple, but I didn't, like, count how many it was.

Q.      Did they have any color to them at all?

6

> A.      It was dark, like dirt.
> Q.      So you could see dirt in the tracks?
> A.      Yes.

(*Id*. at 21-22).  Millissa further described the substance as follows:

> Q.      Can you give me an estimate as to how thick it might have been?
> A.      Probably as thick as, like, hand sanitizer.
> . . . .
> Q.      Oh, hand sanitizer.  Thank you.  So you were thinking it was like that.
>         And do you have any idea – I mean, as far as thickness, as far as how thick
>         it might have been, any idea at all?
> A.      No.
> Q.      Your mom described that it had – that the edges seemed to be solid.  Did
>         you see anything like that at all?
> A.      It was, like – it was drying, but it wasn't completely dry around the puddle.

(*Id*. at 26-27).

Millissa testified that she did not see the substance on the floor before her mother fell, but

that she did see the substance after her mother fell:

> Q.      Was that – was the area where she slipped, was it visually accessible to
>         you?  Could you see that area of the floor as you walked?
> A.      Yes, I saw the tracks in it.
> Q.      And while you were walking to the aisleway you were going to, did you
>         see anything on the floor?
> A.      Before or after –
> Q.      Before she fell.
> A.      No.
> Q.      And is the first time you saw it after she fell, when she showed you where
>         she fell or where she slipped?
> A.      Can you repeat the question?
> Q.      Was the first time you saw the stuff on the floor, was it after she slipped?
> A.      Yes.
> Q.      And did your mom show it to you or did she point to it?
> A.      I pointed to her and told her that was something that she slipped on.
> Q.      And that was after you came and you looked for it?
> A.      Yes.

(*Id*. at 35-36).[2]

C.    Procedural History:

Plaintiff filed this action against Defendant in Wayne County Circuit Court on November

15, 2007.  Thereafter, Defendant removed the action to this Court, asserting diversity

jurisdiction.

Plaintiff's complaint asserts two counts: "Count I - Negligence of Defendant" and "Count

II - Nuisance."  Plaintiff later stipulated to the dismissal of Count II.  (Docket Entry No. 10).

Thus, Plaintiff's negligence claim is the only remaining claim in this action.

On December 16, 2008, Defendant filed the instant Motion for Summary Judgment,

pursuant to FED. R. CIV. P. 56.  Plaintiff filed her Response on January 6, 2009.  Defendant did

not file a Reply Brief.

 Standard of Review

Summary judgment is proper when there are no genuine issues of material fact in dispute

and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  In

deciding a motion for summary judgment, the court must view the evidence and draw all

reasonable inferences in favor of the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986).

ANALYSIS

Both parties agree that Michigan law controls in this diversity case.  Defendant contends

_____

[2]It appears that Plaintiff submitted a written incident report following the accident (*see*
Dep. Tr. of Millissa McAdory at 34; Pl.'s Dep. Tr. at 54) but neither party has submitted the
report to the Court.

8

that, under Michigan law, it is entitled to summary judgment with respect to Plaintiff's

negligence claim on two grounds.

A.     Has Plaintiff Presented Sufficient Evidence To Create An Issue Of Fact As To
       Constructive Notice Of The Alleged Hazard?

Defendant first claims that Plaintiff cannot set forth a prima facie case of negligence

against it because Plaintiff has failed to present evidence that either: 1) Defendant's employees

placed the alleged substance on the floor; or 2) that Defendant had constructive notice of the

alleged hazard.

Under Michigan law, a store owner is liable for injuries from unsafe conditions only if the

condition is caused by the store owner or its employees' negligence or, "if otherwise caused,

were known to the storekeeper or is of such a character or has existed a sufficient length of time

that he should have had knowledge of it." *Clark v. Kmart Corp*., 465 Mich. 416, 419 (2001).

Here, Plaintiff does not assert that there is any evidence to establish that Defendant's

employees placed the substance on the floor.  Rather, Plaintiff appears to rely exclusively on the

theory of constructive notice.  Thus, Plaintiff must show that Defendant should have known that

the unsafe condition existed.

Notice may be inferred from evidence that the unsafe condition has existed for a length of

time sufficient to have enabled a reasonably careful storekeeper to discover it.  When no

evidence shows that the condition has existed for a considerable time, summary judgment in

favor of the storekeeper is proper.  *Whitmore v. Sears, Roebuck & Co.*, 89 Mich.App. 3, 8 (1979);

*Guthrie v. Lowe's Home Centers, Inc*., 204 Fed.Appx. 524 (6th Cir. 2006).

"Michigan law does not require [Plaintiff] to have personal knowledge of how long the

9

dangerous condition existed, but she does have to present some affirmative evidence that points to the condition having existed for more than mere seconds." *Guthrie, supra*, at 527.

In response to Defendant's motion, Plaintiff contends that she has presented sufficient evidence to create a question of fact as to whether the substance was on the floor for a long enough period of time such that Defendant had constructive notice of the hazard. Plaintiff contends that the testimony shows that "the substance was there long enough for other shoppers to travel through the area," as reflected by the multiple dirty tracks running through the puddle, and that the substance had been exposed to the air long enough that portions of the thick puddle had already dried.

Several decisions following *Clark* reflect that summary judgment in favor of the defendant is appropriate when the plaintiff has failed to present *any* evidence other than the mere presence of the substance. Several decisions, however, indicate that constructive notice of a hazardous condition may be supported by reasonable inferences drawn from the very kind of evidence that Plaintiff has presented here. For example, in *Spencer*, although the court found that plaintiff had failed to present evidence establishing that the substance had been on the floor for a long enough period to provide constructive notice, it noted that plaintiff has testified that the substance at issue (smeared banana) "had not begun to discolor or dry out." *Spencer v. Kessel Food Markets*, 2002 WL 1065623 at *2 (Mich.App. 2002). Similarly, in *Guthie*, the Sixth Circuit observed that the plaintiff had "presented no evidence of any footprints or cart lines" through the substance that was on the floor. *Guthrie, supra*, at 527.

Here, Plaintiff has presented testimony indicating that: 1) there was a thick (*i.e.*, an inch to an inch and a half) puddle of a clear, substance on the floor; 2) portions of the puddle had

10

already dried by the time Plaintiff slipped on it; and 3) there were multiple, dirty "tracks" running through the puddle. The Court concludes that, construing the evidence presented in the light most favorable to Plaintiff, she has presented sufficient evidence to create an issue of fact as to constructive notice.

B.   Has Plaintiff Presented Sufficient Evidence To Create An Issue Of Fact As To Whether The Hazard Was Open And Obvious To A Reasonable Person Upon Casual Observation?

Under the open and obvious doctrine, where dangers are know to the invitee or are so obvious that the invitee might reasonably be expected to discover them, an invitor owes no duty to protect or warn the invitee. *Novotney v. Burger King Corp.*, 198 Mich.App. 470, 473 (1993). Thus, open and obvious dangers "are not ordinarily actionable unless unique circumstances surrounding the area made the situation unreasonably dangerous." *Bertrand v. Alan Ford, Inc.*, 449 Mich. 606, 614 (1995).

Defendant asserts that "[a]ssuming it was a danger at all, this potential 'danger' of a large puddle of some sort of substance on the floor was open and obvious to any person of ordinary intelligence." (Def.'s Br. at 18). Defendant contends that under *Novotney*, Plaintiff must come forth with sufficient evidence to create a genuine issue of fact that an ordinary user upon casual inspection could not have discovered the condition. Defendant asserts that Plaintiff cannot do so here. Defendant contends that the lighting in the store was good and that there was nothing in the area to obscure observation of the substance on the floor. Defendant asserts that "Plaintiff simply was not paying sufficient attention to her surroundings and failed to notice what may have been there to be seen." (Def.'s Br. at 19).

In response, Plaintiff contends that she has presented sufficient evidence to create an

11

issue of fact as to whether the hazard was open and obvious.  Plaintiff stresses that the substance

at issue was clear and thus invisible at the time of the incident.  She also stresses that the fact that

her daughter passed through the same area shortly before the fall and also did not see the

substance can be considered evidence supporting that the hazard was not open and obvious.

Plaintiff relies on the unpublished *James v. Chuck E. Cheese* decision that is attached to her brief

as Exhibit 3.

The Court agrees that Plaintiff has presented sufficient evidence to create a question of

fact on this issue.  The test to determine if a danger is open and obvious is whether an average

user with ordinary intelligence would have been able to discover the danger and the risk

presented upon casual inspection.  *Bartness v. Borman's, Inc*., 2007 WL 2572007 (E.D. Mich.

2007)(citing *Kennedy v. Great Atlantic & Pacific Tea Company*, 274 Mich.App. 710 (2007);

*Novotney, supra*).  Because the test is objective, the court looks not to whether a particular

plaintiff should have known that the condition was hazardous, but to whether a reasonable person

in his or her position would have foreseen the danger.  *Id.*

The Court must accept the facts as alleged by Plaintiff and draw all inferences in her

favor.  Applying this standard, the Court concludes that there is a question of fact as to whether

the substance on the floor was open and obvious.  Plaintiff testified that she did not see the clear

substance, that had partially dried, on the floor before she fell.  In addition, her daughter testified

that she had walked through that area, shortly before Plaintiff slipped, and had not observed the

substance.  After she had slipped, Plaintiff and her daughter were able to see the clear substance

on the floor and describe it.  However, the "fact that plaintiff and her [daughter] were able to

discover the [substance] after their attention was drawn to it" after Plaintiff slipped "does not

12

establish that it was visible upon 'casual inspection.'" *James, supra; Bartness, supra.* Based on
the evidence submitted by Plaintiff, it is not clear as a matter of law that an average user with
ordinary intelligence would have been able to discover the danger and the risk presented by the
spilled substance upon *casual inspection.*

CONCLUSION &amp; ORDER

For the reasons above, IT IS ORDERED that Defendant's Motion for Summary Judgment
is DENIED.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  April 21, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on
April 21, 2009, by electronic and/or ordinary mail.

s/Jennifer Hernandez
Case Manager

13